Mr. Stolte, are you with us? Yes. Your camera's on? I believe so. I can see myself. Mr. Martin, are you with us? Your mic's muted. I'm sorry, yes. Good morning, all in your honors. Okay, thank you. Case number 20-1192, Joseph Carter v. Atrium Hospitality. Mr. Stolte, would you begin your argument? Thank you, your honor. In this court's de novo review of the record of the summary judgment ruling, the 8th Circuit has the ability to, by relying on current and past Iowa case law, to reverse the ruling of the District Courts and granting summary judgment on this case. In fact, should reverse on all matters, provided the court obviously not put itself as a fact finder, which is the standard for summary judgment. One of the issues that the appellant had with the District Court's ruling is the District Court consistently made, put itself in a fact finder role and did not give inferences to the appellant under all the actual, under all the issues involved. Starting with, and this is an argument that the plaintiff, that the appellant starts with, is the discrimination factor for his termination. The appellant argues that there's binding Iowa Supreme Court case law that shifts this focus for the 8th Circuit Court of Appeals in weighing whether termination is discriminatory or not by utilizing the motivating factor analysis rather than strictly McDonnell-Douglas. In fact, as noted in the case, Couch v. American Bottling Corporation, a company, as cited to by the appellee, the 8th Circuit has dealt with prior to this the aspect from Headland, Hawkins, from the cases cited to in Headland and Hawkins in regards to a motivating factor analysis. However, a motivating factor analysis and the Headland case to which the Couch v. American Bottling Company court cited to the Headland case clearly states that, clearly utilizes two tests in its ruling. It utilizes both McDonnell-Douglas test and a motivating factor test, which becomes binding on this court. In essence, the... Your case, this is Judge Smith, regardless of which one of those methodologies is used, McDonnell-Douglas or motivating factor, you would still need to establish and be able to overcome a legitimate reason for the termination. Yes, Your Honor. However, the overcoming the legitimate reason is more question for the jury that happens at trial. As cited to in Hawkins, it becomes a jury question as to whether the defendants, in fact, had any issue, had a legitimate non-discriminatory reason that they would have made the choice anyway to terminate him. And in fact, as cited to... Oh, sorry, Your Honor. I was going to issue one more. I was going to issue one more supporting authority to that if you... Go ahead. Yes, Your Honor. In fact, cited to in plaintiff's and appellant's brief, the case of Hofer, motive and intent is, in fact, also a jury question to be determined at trial. So, in essence, whether the appellant can overcome it or not is more of a question for the jury, not for the court to make, in effect, find a position. Well, what if... Excuse me. Sorry, Chief. Go ahead. No, if there's evidence brought forth that there's a legitimate reason for termination and doesn't... to give rise to a question of fact on the question of pretext. Well, Your Honor, the Iowa Supreme Court has never, in fact, said that pretext is, in fact, necessary in a motivating factor case analysis. Well, don't you still have to point to some quantum of evidence that would somehow raise a dispute about whether or not the legitimate factor was the reason for termination? I don't believe so, Your Honor. The reason being that in the Hawkins case analysis, the burden does not ever shift back to plaintiff. The plaintiff has a starting burden in a motivating factor analysis to prove that there is, in fact, that the discriminatory characteristic has some sort of impact on it. And then the burden shifts to the defendant. And there is no shift back. The burden shifts to the defendant that they would make the decision otherwise. And then that alone goes to the jury. There is no pretext analysis that goes into it in a motivating factor analysis. Counsel, what was the evidence of record that the key issue was racially motivated? The termination for the misuse of the key. Where was the what was the evidence of the record that that was connected to the defendant to the plaintiff's race? Well, Your Honor, in showing all the past treatment, along with the past treatment that the defendant that the appellant suffered at the hands of his employer, along with all the actual slurs issued to him by cotton picker or porch monkey boy, along with the fact that he was told he would not get jobs because he was black. By one of his direct supervisors, combined with in regards to the directly to the key card issue, the employee, Alan Williamson, who Mr. Carter both told his employer and testified to in his deposition. This Alan maintenance person and chief engineer, I believe, is what is shown that he is this. Alan Williamson was not, in fact, disciplined for his actions. Your Honor. In fact, the determination by the cited to in the appellee's brief page 11, they just determined, well, he wouldn't have needed Mr. Carter to create the key. Well, however, that doesn't change the fact that inferences given to the appellant that the appellant should therefore be believed in this matter that, in fact, Alan Williamson was the one who told him to create the key. And Williamson was, in fact, not disciplined for it. Your Honor. Moving a little bit further because we are cutting. I'm about to start cutting into my rebuttal time moving a little further to the harassment and hostile work environment claims. Your Honor. Well, actually, before I do that, I want to did want to say Watkins v. That's a recent Iowa Court of Appeals case has, in fact, stated and is superseding Iowa case law in regards and issued after the circuits couch ruling, stating essentially that the analysis is under both because it remains open question whether summary judgment is used. And in fact, that's along with the district court ruling cited to in our brief, both use utilize both factors and both analyses. But moving to the hostile work environment claim, your honors. We believe that the district court erred and really there was a significant less lack of case law on it that we were a little bit troubled by. In the fact that there was a usage saying that the claims by appellant of being called racial slurs to three times per month did not fall within any statutory timeline. Formal and foods at. Formal foods at forty one, six, forty one or actually states that there is, in fact, a if any hostile work environment claim, if any of the continuing violation of the hostile work environment is found within the within the time period and the entire time period of the employment is, in fact, found within the time period. And this also after dodging after attempting to dodge this and the police backs up, he tries to attempt to back up the district court's ruling. There's a they try and argue some sort of sham doctrine, which does not, in fact, exist and relates to as it relates to Iowa civil rights actions and does not relate to title seven civil rights actions. As cited to him, McElroy v. State as cited to an appellee's case. Anything reasonably related to the allegation made in the civil rights complaint is considered exhausted administratively and within the limitations. So so is your position is by including, I think, the assertion that he was called boy throughout his employment time in the in the civil rights complaint that then that subsumes the later additional slurs that were used at work. Is that is that what you're saying? I believe, yes, it includes it. Any anything released? Anything related reasonably to boy, which, as we all know, is colloquially used in a racial terminology is then therefore exhausted. And that's to further the liberal construction of the civil rights statutes statutes. When I was cited to that, that cited to it cited to to type a circuit case law cases in regards to that to include the sham doctrine in this case would to create it would be to create an exception that swallows the rule and removes the entire purpose of the liberal construction to include everything together. Well, I I understand your position. It seems that it would be a stronger position if the complaint said sort of generally I was I was called names such including or something like that or this sort of name calling or disrespect from from other employees. I'm just not seeing the language that sort of would subsume additional slurs and additional disrespect. Can you point me to something in the in the complaint? Well, Judge Kelly, I believe boy in and of itself is does that due to the fact that it was really, in fact, and along with the rest of this narrative, it mentions massive amounts of it mentions quite a bit of racial discrimination. You know, it subsumes it in essence because of it. The entire point is to allow people to say something, especially when they are, in fact, not represented or represented. And maybe they didn't remember something. All of it is to stop the dis the disgusting aspect of racial discrimination or discrimination. So your approach is more of a sort of fact or circumstance specific. You're not you're not proposing some kind of general rule for how broad this would be. You're just saying in this particular situation, it's just so obvious that a slur would include a number of other related slurs. Yes, you are. Yes. No, I've been cutting into my rebuttal time quite a bit. So I'm going to go ahead and reserve the rest of my time for rebuttal. Thank you, Mr. Stolte. All right, Mr. Martin. Yes. Thank you, your honors. I'm on correct. Yes. All right. Good morning, your honors and counsel. May it please the court. I represent Atrium Hospitality, which owns the Sheridan West Des Moines. This is a straightforward summary judgment case on claims of race discrimination and termination, race discrimination and failure to promote and hostile work environment. Now, my client, Atrium, fired hotel front desk clerk Joseph Carter after an April 2017 investigation showed that he took room 617 out of order. He made a key for room 617, and he gave that key to unregistered guests found in room 617. In fact, Mr. Carter 100% agreed at his deposition that he took room 617 out of order. He made the key without having a guest. He took that key from the front desk area, and he has no idea what he did with the key. Now, that key ended up with Greg Argo, who was arrested in room 617 with two underage girls, drug paraphernalia, and evidence of meth use. Now, Mr. Carter initially told Atrium in that 2017 investigation that he left the key at the front desk and he did not take it. He similarly told the Iowa Civil Rights Commission in his sworn statement that he, quote, left the key at the front desk when I left for that day. But at his depo, your honors, I played the front desk video to him, which shows him making the key with no guests, leaving the key on the desk for about 20 minutes, then pocketing that key and leaving with the key. And then he admitted that, yes, he did leave with the key, but he still doesn't know how the key ended up with this other gentleman. So basically, he lied to his employer and the ICRC about leaving the key up front, and he admitted this at his deposition. Now, Mr. Carter's conduct created huge liability risks for Atrium, and Mr. Carter himself admitted in his deposition that the conduct that he was accused of would violate Atrium's rules of conduct policy in five ways. Regardless, Mr. Carter now appeals Judge Pratt's summary judgment on the three ICRA claims, and our position is, of course, that he cannot create a fact question on any of those claims. What about the hostile work environment claim? When did he first make allegations to Atrium about his colleagues' conduct, and how was that addressed by Atrium? Well, your honor, he testified that he made the allegations to Atrium. Atrium's, if you look at the declaration of Jacinta Carter, who's an African-American head of HR at the company, she said there was never an ethics line complaint made by Mr. Carter. Now, he testifies in his deposition that he repeatedly called the ethics line. There was an investigation into a comment that was more than a year old involving the N-word and a Matt Glenn, and if the court looks at the interview notes, which are in my supplemental addendum, it shows Mr. Carter was asked if he was ever called a derogatory term by anybody, and he said no, he had not. And, of course, that was as of that point in time, but then he also indicated that, you know, that he used that word in the workplace. Both he and Mr. Glenn received a warning relating to that. Does that answer your honor's question? Well, to some degree, but I guess what I'm trying to discern here is what was he advising the company of in terms of how he was being treated over his work experience, and what does the company's records and the company have in the record showing how those complaints were addressed? The company has nothing in the record because nothing was actually said to them. I know he testifies now after providing his ICRC statement, but there's nothing in the record because he didn't call the ethics line and he didn't talk to anybody about it. I understand that, you know, it's his position that he did, but to the extent anything was brought to him and that one untimely matter was brought to the company and the company did investigate, you know, so that they dealt with it the one time that they believe that it came up. Counsel mentioned another individual involving having a key issue with the company not being disciplined. Do you have a response to that as a matter of desperate treatment? You mean as it relates to the discriminatory warnings? Not to the warnings, but as to the discharge. Okay, are you talking about the allegation that Alan Williamson made the key or called him about the key? Yes. Okay. What they're alleging is that Mr. Carter, in being asked why he took this room out of order, he at first told the ICRC that he took it out of order, and then later he got a call from somebody in maintenance asking him to take the room out of order. There's no allegation that he actually made a key, but Mr. Carter is saying that he got a call from somebody who he thought might be Mr. Williamson telling him to take the room out of order. There is zero evidence that anybody else ever made a key, took a room out of order, and gave the key to somebody. What they were talking about, you know, what counsel was talking about relating to was this very incident and Mr. Williamson allegedly asking him to take the room out of order. But he has no explanation as to why he walks away with this key, why he pockets this key, and there's no evidence that it was Mr. Williamson. He said Mr. Carter said that he thought it might be Mr. Williamson. That's what he testified to. Of course, he also told his company and the Iowa Civil Rights Commission that he left the key up front and he never took the key away when the video shows otherwise. Would you address the operation of Iowa law here with respect to the— and precisely what Iowa law is regarding the motivating factor versus kind of the shifting burdens analysis typically used in federal court versus what Iowa state law is? Yeah, you know, Your Honor, there is this suggestion that there is this motivating factor test that's applied at the trial stage in the Hawkins case, but that was a trial case. After that, the Iowa Supreme Court applied McDonnell-Douglas to summary judgment in Hedlund. They also applied a—they looked at it under motivating factor, but they applied McDonnell-Douglas first. And, you know, the Eighth Circuit then in Couch said that, you know, we presume the Iowa Supreme Court meant what it says, and that is that we still apply McDonnell-Douglas. So to me, though, whether you apply the motivating factor or McDonnell-Douglas, this is not a close call on discriminatory termination under McDonnell-Douglas or the motivating factor test. There is zero evidence that Chris Stockman, who was the decision maker here and who did the investigation, was somehow motivated by race. There's no allegation that Stockman ever said anything racial or did anything racial. And also, I believe, you know, that Atrium's investigation really dovetails with this Eighth Circuit's honestly-believed case law laid out in cases like Twyman, Alvarez, Pulsinski, Maine v. Ogsark, which I think was a recent case here. You know, fundamentally, Chris Stockman, and he testified to this, that he honestly believed the investigation showed Mr. Carter did all this. And it turns out Mr. Stockman's honest belief is right. Mr. Carter did make the key and take the key to Room 617, and it ended up with an unregistered guest. That's what the investigation showed. Now, they talk a little bit about how, you know, the whole decision was called into question because there were these discriminatory warnings. Mr. Carter initially told the Iowa Civil Rights Commission in his sworn statement under penalty of perjury that he received no disciplinary warnings at Atrium. Regardless, he now claims that the nine disciplinary warnings that he had at Atrium were somehow discriminatory. But he signed off on all nine of those without balking or adding any comments. And this included serious security violations, including one where he left the CK1 guard key at the front desk unattended, which is a key that would allow somebody to make keys to any occupied room in the hotel, which obviously puts the hotel at risk. Now, there's zero evidence that any white employees similarly left the guard key out and were not disciplined. In fact, when I asked Mr. Carter about it, he just said that he believes that white employees weren't disciplined, but he didn't have any evidence of that. The only thing that I saw in the reply brief about these prior warnings is counsel talks about how Mr. Carter was disciplined for his Facebook use. If you look at the 10 warnings that are found at Appendix 264 to 274, there are no warnings for Mr. Carter using Facebook on the job. He never got disciplined for that. Go ahead and finish your thought if you have another. I just had a question about the hostile work environment claim. Why isn't it enough to allege I was called a particular name or slur on a regular basis? Why isn't that sufficient to sort of, for a reasonable inference, that there were other similar types of, I guess, transgressions on the workplace of a similar kind? Yeah, well, he didn't say something like I was called a variety of slurs. He talked about this reference to Boyd. But I think if the court looks at what the question has posed, it's in my supplemental addendum. It's at pages 208 to 210 of the appendix. But it asks him to answer the expansive questions under oath of describe what happened to you, state how you were discriminated against, and be sure to address each action. And in response, we got this 855-word signed statement under penalty of perjury and given three weeks after his termination. And it goes through everything bad that happened to him at that employer. And, you know, you go through those 855 words, and nowhere do you see what may be the most offensive racial slur in America, and that's the N-word. It doesn't appear in there. And there's no reference to other potential slurs. So, you know, I think this sworn statement given under penalty of perjury in 2017, and then suddenly in 2019 at his deposition, you know, maybe he thought the case was going sideways. I don't know. But, you know, suddenly there are these allegations that I was called the N-word throughout the workplace. And, you know, and I will note, too, and it's in footnote two of my brief, their fact section in their appeal brief is all of two pages, and there are no sites to the record. There are sites to their prior summary judgment brief, but there's that home lie in a case law that, you know, judges are not archaeologists or ferrets or whatever it is that, you know, having to go through the record to actually find things on behalf of the plaintiff. You know, and if the court has additional questions, I can address the failure to promote the claim as well. You know, I will say, though, on this hostile environment, there's no evidence. Was there any allegation of anything physically threatening or humiliating in any of the statements made by the plaintiff? You know, he testified that he was called lazy N-word. He testified that they said cotton picking, these maintenance folks, when they would pass by him at the front desk. I don't recall anything physically threatening, Your Honor. Certainly those are, you know, awful terms that have no place in the workplace. But, you know, the first this came up was in 2019 at the deposition. You know, and there's a whole line of cases from the Wilson case and Camfield that say that, you know, and it doesn't matter if the deposition is first or the affidavit. There's even a case from the Iowa Supreme Court recently where an expert gave a report and then tried to testify counter to their report, and they held the expert to the report under the contrary statements rules. So I think, you know, it's apt here and should be applied. You know, on failure to promote, I'll also add that the three people who were hired were all objectively more qualified than Mr. Carter for the AFOM job. That's assistant front office manager. Notably, before those three were hired, Atrium hired a black individual, and right after those three, they hired another black individual. But Mr. Carter's qualifications at that time included that he had nine warnings he had signed at Atrium. He had worked at 13 employers the last 10 years. He had no schooling and hospitality. He'd been fired from three area hospitals, and he'd never been a manager. These other folks, they were highly recommended. They had degrees in event management. One was pursuing a degree in hospitality. So I would say that they were all objectively better qualified for the AFOM position. I see I'm out of time, but if the court has any questions, I'd be happy to address them. Thank you, Mr. Martin. Thank you, Your Honor. Mr. Stolte, your rebuttal. Yes, Your Honor. Notably, as far as I can tell, the entire argument of Atrium, as well as their statement of the case, they consistently say, well, this is a different fact to what he testified to earlier, or maybe this is different than what Atrium found. And every single time he says that, he is asking the court to make an improper choice, to ask the court to step out of its bounds and summary judgment, and instead make a determination that Carter was a liar or that Carter was wrong. That is just improper for them to do within the bounds of summary judgment. He consistently says these things, which only evidence the fact that there were material facts in dispute. The mere utterance of the majority of Mr. Martin's arguments was the fact that there were, well, Atrium thought this way, while Carter thought this way. Carter testified to this, but there's no evidence in Atrium's aspect of it. The fact is, that is material facts in dispute. And the mere fact that they just want the court to believe Atrium, even though summary judgment law is to give all reasonable inferences to the non-moving party, in this case Carter, is just improper and asks the court to step outside their bounds, not only in de novo review, but in a summary judgment standard. In addition, notably in their case, they also talk about this Iowa Supreme Court case called Suzy. The first name is titled Suzy. That case was in a medical malpractice case, where the medical malpractice provider provided an expert report, 1.908 report. And that 1.908 report was different than their deposition testimony. If you read the case, the deposition testimony actually states, the court actually says, we're going to hold them to the deposition testimony, which is contrary to the 1.908 matter, 1.908 report. And the 1.908 report cannot show that there was, that there's a material fact in dispute. Plus it goes back to the exception swallowing the rule. Nonetheless, Your Honor, I see that my time has expired. And therefore, unless the court has any further questions, I yield my time. And thank you all for your time and ask that you reverse and remand these rulings. Thank you, Mr. Stolte. Thank you also, Mr. Martin. Court appreciates both counsel's presence before the court today. And the briefing that you've submitted will take the case under advisement, rendered decision in due course. Thank you.